**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: _____**

AIDS HEALTHCARE FOUNDATION, INC.,

     Plaintiff,

     v.

JACK CARREL; MAURICIO FERRER; SHAWN
LOFTIS; THEODORE J. LEOPOLD, ESQ.;
COHEN MILSTEIN SELLERS & TOLL, PLLC;
SALPETER GITKIN, LLP; AND THE KAISER
LAW FIRM, PLLC,

     Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, AIDS Healthcare Foundation, Inc. ("AHF"), files the following Complaint for

Injunctive Relief and Damages ("Complaint") against Defendants, Jack Carrel ("Carrel"),

Mauricio Ferrer ("Ferrer"), Shawn Loftis ("Loftis"), Theodore J. Leopold ("Leopold"), Cohen

Milstein Sellers & Toll, PLLC ("Cohen Firm"), Salpeter Gitkin, LLP ("Salpeter Firm"), and the

Kaiser Law Firm, PLLC ("Kaiser Firm") (all collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.     Plaintiff AIDS Healthcare Foundation seeks an injunction and damages as a result

of Defendants' unlawful use and disclosure of highly confidential, individually-identifiable

information about people who tested positive for HIV.  As described in more detail below,

Defendants seek to use this information, improperly obtained from plaintiff AHF, as leverage in a

lawsuit brought by former AHF employees and Defendants Carrel, Ferrer, and Loftis ("*Qui Tam*

Relators") alleging violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et. seq*. (the "*Qui Tam* Case.")   But federal and state laws prohibit the unauthorized use of patient information and especially HIV test results for any such purpose and impose criminal penalties for its misuse.   This suit is needed to safeguard this protected health information, return it to AHF, and obtain compensation for damages resulting from Defendants' malicious and reckless actions.

## PARTIES

2.       Plaintiff AHF is a California not-for-profit corporation, which is domiciled and has its principal place of business in Los Angeles, California.  AHF is a nonprofit, tax-exempt 501(c)(3) organization that provides cutting-edge HIV/AIDS medical care and advocacy to more than 400,000 patients in 36 countries, including the United States.

3.       Defendant Carrel is an individual who, on information and belief, resides in the State of Louisiana.  Carrel was formerly the Director of Public Health, Southern Bureau of AHF, from around August 9, 2012, to August 9, 2013.

4.       Defendant Ferrer is an individual who, on information and belief, resides in the State of Florida.  Ferrer was formerly a Senior Program Manager, Southern Bureau of AHF, from around May 18, 2011, to August 22, 2012.

5.       Defendant Loftis is an individual who, on information and belief, resides in the State of New York.  Loftis was formerly the Grants Manager, Southern Bureau of AHF, from around January 2, 2013, to August 16, 2013.

6.       Defendant Leopold is an individual who, upon information and belief, resides in the State of Florida; is a member of the Cohen Firm; has Florida Bar No. 705608; and is one of the identified attorneys representing the *Qui Tam* Relators in the *Qui Tam* Case.

7.       Defendant, the Cohen Firm, is a law firm that, upon information and belief, employs Defendant Leopold, as well as attorneys Diana Martin ("Martin") and Leslie Kroeger

("Kroeger"), and has offices in several states, including Washington, D.C., New York, Pennsylvania, Illinois, Colorado, and Florida.  The Cohen firm is vicariously liable for all of the acts and/or omissions of Leopold, Martin, and Kroeger and independently liable for its own wrongful acts and/or omissions.

8.      Defendant, the Salpeter Firm, is a law firm that, upon information and belief, employs attorney James P. Gitkin ("Gitkin") and has two offices operating in the State of Florida. The Salpeter Firm is vicariously liable for all of the acts and/or omissions of Gitkin and is independently liable for its own wrongful acts and/or omissions.

9.      Defendant, the Kaiser Firm, is a law firm that, upon information and belief, employs attorney Geoffrey R. Kaiser and has an office in the State of New York.  The Kaiser Firm is vicariously liable for all of the acts and/or omissions of Kaiser and is independently liable for its own wrongful acts and/or omissions.

## JURISIDCTION AND VENUE

10.      The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).  There is complete diversity of citizenship between AHF and each of the respective Defendants.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.      This Court has personal jurisdiction over the Defendants because Defendants committed improper and illegal acts in this judicial district and availed themselves of this Court's jurisdiction in the *Qui Tam* Case.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims raised herein occurred in this judicial district and Defendants selected this forum for the *Qui Tam* Case.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A. Relators' Knowledge of the Highly-Sensitive and Confidential Nature of Patient Health Information, Especially HIV Testing Information**

### (i)  Jack Carrel

13.     Defendant Jack Carrel applied for AHF's position of Director of Public Health in June 2012.   In his resume, he stated he had "[o]ver 28 years experience in reproductive health education including HIV . . ." and listed significant experience in HIV testing and program development.  The core responsibility of the Director position is to oversee AHF's HIV testing programs in AHF's Southern Bureau.  In these programs, which are often funded by government agencies, AHF offers free testing in the community and at its facilities, targeting individuals at high risk of infection, and linking newly positive HIV individuals to medical care.  Once established in care and adhering to their treatment, people with HIV are healthy and essentially noninfectious.

14.     On or about July 2, 2012, Carrel signed an "Acceptance of Offer" for employment with AHF as Director of Public Health (the "Carrel Agreement").  His job description, included with the Agreement, informed him that "[t]o perform the job successfully," he should "[m]aintain [c]onfidentiality" and "[w]ork with integrity and ethically."  The cover letter to the Agreement informed Carrel he was required to complete HIPAA (The Health Insurance Portability and Accountability Act of 1996) training upon employment, which he completed on or about August 9, 2012.

15.     In addition to the Carrel Agreement, Carrel also signed the following documents:

a.     Confidentiality Policy:  This document states that "[a]s an employee of the AIDS Healthcare Foundation," Carrel "shall maintain the confidentiality of all information that may be obtained or used in the provision of services, including, but not limited to, county record, patient records, and billings.  As an employee of the AIDS Healthcare Foundation, I shall not

release the name of any patient, or disclose information or records about any patient receiving services to any party, except to authorized representatives without the prior written consent of the patient or his/her lawful representative(s), except as authorized by law."  Carrel signed directly under the part of the Policy that states:  "My signature serves to acknowledge that I have read and understand this policy, and that I will abide by its provisions."

b.     AIDS Healthcare Foundation Confidentiality Agreement:  This document describes AHF's policy to "make[] every effort to respect the confidentiality of its residents and clients," and in this regard, "it is AHF's policy *not* to release names or other information about any residents or clients to the public.  Carrel signed directly under the portion of the Agreement that states "By signing this agreement I agree to respect and abide by the rules of confidentiality stipulated by AHF."

c.     Information Technology ("IT") Access Agreement:  This agreement sets out the rules AHF employees must follow when using AHF's IT resources, and includes a provision prohibiting the communication of "proprietary data, trade secrets, or other confidential information of the company" without express authorization by AHF's General Counsel.  Carrel signed the acknowledgement which stated "I have read and agree to comply with the terms of this Agreement governing the use of AHF's Computer Resources.  I understand that a violation of this Agreement may result in disciplinary action, including possible termination, as well as civic [sic: civil] or criminal liability."

d.     Acknowledgement of Code of Ethics:  This document describes AHF employees' role in maintaining compliance and acting ethically by, among other things, "Protect[ing] the privacy and confidentiality of patient information entrusted to AHF by, at a minimum, securely maintaining the information and disclosing it only pursuant to federal and

state privacy laws and accreditation standards, including HIPAA, and AHF policies and procedures," and "[a]ccess[ing] electronic patient and other sensitive or confidential information only pursuant to appropriate authorizations and privileges and on a 'need to know' basis." Carrel signed directly below the part that says "My signature acknowledges my understanding of AHF's Code of Ethics."

e.      Patient Privacy:  Keeping Electronic Information Safe at AHF:  This policy sets forth in detail AHF's requirements regarding employee handling of electronic patient information, and prohibits unauthorized access, storing, copying, and transmitting of such information.  Carrel signed the "Acknowledgement" in which he agreed to follow the policy.

f.      Receipt of AHF Employee Handbook:  Carrel received a copy of AHF's Employee Handbook, signing a receipt that acknowledged he would review the responsibilities and obligations set forth in the Handbook.   Among those duties is the prohibition against "[u]nauthorized disclosure of business 'secrets' or confidential information," and against "[m]isuing privileged information, or revealing confidential data," and against disclosure of patient lists and patient medical information.

g.      Employee's Exit Statement Regarding Confidentiality.  Upon separation of employment from AHF on August 1, 2013, Carrel signed a statement:  "I recognize and agree that, even after terminating my employment at the AIDS Healthcare Foundation, I recognize that I have a continuing duty to preserve the confidentiality of agency information, pursuant to the Confidentiality Agreement I signed at the beginning of my employment and applicable law.  [¶] Specifically, I shall continue to maintain the confidentiality of all information obtained or used in the provision of services, including, but not limited to, county records, patient records, and billings.  After my employment, I shall not release the name of any patient, or disclose

information or records about any patient receiving services to any party, except as required by law."

### (ii)  Mauricio Ferrer

16.     Defendant Mauricio Ferrer applied for AHF's position of Senior Program Manager of Public Health, Southern Bureau, in April 2011. In his resume he listed significant experience in HIV outreach, education, and linkage.   The core responsibility of the Manager position is to supervise the daily functions and administration of AHF's prevention and testing programs, including programs operated out of AHF's thrift stores and mobile testing units.

17.     On or about May 17, 2011, Ferrer signed an "Acceptance of Offer" for employment with AHF as Senior Program Manager (the "Ferrer Agreement").  His job description, included with the Agreement, identifies as an "essential duty and responsibility":  "Uphold[] and ensure[] code of confidentiality relative to the clients and the testing program in accordance with AHF and HIPAA standards of care and service delivery."  The cover letter to the Agreement informed Ferrer he was required to complete HIPAA training upon employment, which he completed on or about June 28, 2011.

18.     In addition to the Ferrer Agreement, Ferrer also signed the following documents, which are the same as the documents described in paragraph 15 above:

a.     Confidentiality Policy:  Ferrer signed directly under part of the Policy that states:  "My signature serves to acknowledge that I have read and understand this policy, and that I will abide by its provisions."

b.     AIDS Healthcare Foundation Confidentiality Agreement:  Ferrer signed directly under the part of the Agreement that states "By signing this agreement I agree to respect and abide by the rules of confidentiality stipulated by AHF."

      c.     IT Access Agreement:  Ferrer signed the acknowledgement which stated "I have read and agree to comply with the terms of this Agreement governing the use of AHF's Computer Resources.  I understand that a violation of this Agreement may result in disciplinary action, including possible termination, as well as civic [sic: civil] or criminal liability."

      d.     Employee's Exit Statement Regarding Confidentiality.  Upon separation of employment from AHF on August 24, 2012, Ferrer signed a statement:  "I recognize and agree that, even after terminating my employment at the AIDS Healthcare Foundation, I recognize that I have a continuing duty to preserve the confidentiality of agency information, pursuant to the Confidentiality Agreement I signed at the beginning of my employment and applicable law.  [¶]  Specifically, I shall continue to maintain the confidentiality of all information obtained or used in the provision of services, including, but not limited to, county records, patient records, and billings.  After my employment, I shall not release the name of any patient, or disclose information or records about any patient receiving services to any party, except as required by law."

### (iii)  Shawn Loftis

19.     Defendant Shawn Loftis applied for AHF's position of Grants Manager, Southern Bureau, in December 2012.   The core responsibility of this position is to be responsible for all pre and post-award grant administration activities including:  development of proposed program budgets, monitoring and facilitating all aspects of AHF's county, state, and federal grants, along with grant-related program budget issues, financial reporting and indirect cost-recovery functions.

20.     On or about January 2, 2013, Loftis signed an "Acceptance of Offer" for employment with AHF as Grants Manager (the "Loftis Agreement").    The cover letter to the

Loftis Agreement informed Loftis he was required to complete HIPAA training upon employment, which he completed on or about January 2, 2013.

21.     In addition to the Loftis Agreement, Loftis also signed the following documents, which are the same as the documents described in paragraphs 15 above:

a.     Confidentiality Policy:  Loftis signed directly under part of the Policy that states:  "My signature serves to acknowledge that I have read and understand this policy, and that I will abide by its provisions."

b.     AIDS Healthcare Foundation Confidentiality Agreement:  Loftis signed directly under the part of the Agreement that states "By signing this agreement I agree to respect and abide by the rules of confidentiality stipulated by AHF."

c.     IT Access Agreement:  Loftis signed the acknowledgement which stated "I have read and agree to comply with the terms of this Agreement governing the use of AHF's Computer Resources.  I understand that a violation of this Agreement may result in disciplinary action, including possible termination, as well as civic [sic: civil] or criminal liability."

d.     Acknowledgement of Code of Ethics:  Loftis signed directly below the part that says "My signature acknowledges my understanding of AHF's Code of Ethics."

e.     Patient Privacy:  Keeping Electronic Information Safe at AHF:  Loftis signed the "Acknowledgement" in which he agreed to follow the policy.

f.     Receipt of AHF Employee Handbook:  Loftis received a copy of AHF's Employee Handbook, signing a receipt that acknowledges he will review the responsibilities and obligations set forth in the Handbook.

g.     Employee's Exit Statement Regarding Confidentiality.  Upon separation of employment from AHF on August 16, 2013, Loftis signed a statement:  "I recognize and agree

that, even after terminating my employment at the AIDS Healthcare Foundation, I recognize that I have a continuing duty to preserve the confidentiality of agency information, pursuant to the Confidentiality Agreement I signed at the beginning of my employment and applicable law.  [¶] Specifically, I shall continue to maintain the confidentiality of all information obtained or used in the provision of services, including, but not limited to, county records, patient records, and billings.  After my employment, I shall not release the name of any patient, or disclose information or records about any patient receiving services to any party, except as required by law."

22.    Based on the  *Qui Tam* Relators' career history and experience, as well as their training and education at AHF, each Relator had actual knowledge regarding the highly-sensitive and confidential nature of AHF health information related to its patients and their HIV status, and the prohibitions against improper disclosure.

### B.  Relators' Counsel's Knowledge of the Laws Regarding Patient Confidentiality

23.    Florida law provides for civil and criminal penalties for the misuse of HIV test information.  *See* Fla. Stat. § 381.004.  HIPAA also imposes criminal sanctions for wrongfully obtaining or disclosing individually identifiable health information.  42 U.S.C. § 1320d-6.

24.    The Cohen Firm boasts on its website that its lawyers have nation-wide expertise in filing of False Claims Act *qui tam* lawsuits, including those related to statutes in the health care industry.  *See* http://www.cohenmilstein.com/practices.php?PracticeID=10 (last visited Apr. 17, 2015) ("The Cohen Milstein Sellers & Toll PLLC Whistleblower/False Claims Act Practice Group has decades of combined experience successfully pursuing whistleblower cases under the ***federal and state false claims act statutes in the health care***, pharmaceutical, and defense contractor ***industries***, and in other industries that transact business with the government." (emphasis added)).

Martin and Kroeger's web profiles tout their expertise in managed care matters, and Kroeger's expertise in medical malpractice.  Thus, the Cohen Firm and its attorneys knew or should have known about federal and state laws relating to the improper and illegal dissemination of confidential, individually identifiable health information, especially information that relates to HIV testing.

25.     Gitkin's web-bio represents that he is experienced in the areas of personal injury, medical malpractice and *qui tam* cases.  *See* http://www.salpetergitkin.com/Attorneys/James-P-Gitkin.shtml (last visited Apr. 17, 2015).  Thus, Gitkin and the Salpeter Firm knew or should have known about  federal and state laws relating to the improper and illegal dissemination of confidential, individually identifiable health information, especially information that relates to HIV testing.

26.     Upon information and belief, Kaiser is a former federal prosecutor and was Chief of Health Fraud Prosecutions in the U.S. Attorney's Office for the Eastern District of New York.  Thus, Kaiser and the Kaiser Firm knew or should have known about federal and state laws relating to the improper and illegal dissemination of confidential, individually identifiable health information, especially information that relates to HIV testing.

### C.  Defendants' Unauthorized and Unlawful Publication of Highly Confidential and Sensitive Patient Information

27.     On or about June 4, 2014, Defendants Carrel, Ferrer, and Loftis, by and through their attorneys, Gitkin, the Salpeter Firm, Kaiser, and the Kaiser Firm, filed a Complaint for Violations of the Federal False Claims Act [31 U.S.C. §§ 3729 *et seq.*] and Florida False Claims Act [§§ 68.081 *et seq.*, Fla. Stat.] ("Original *Qui Tam* Complaint") in the District Court for the

Southern District of Florida, Case No. 0:14-cv-61301 ("*Qui Tam* Case").  At the time, the *Qui Tam*

Relators' employment with AHF had ended.

28.      The Original *Qui Tam* Complaint was filed *in camera* and under seal.

29.      On or about February 10, 2015, the United States filed its Notice of Election to

Decline Intervention in the *Qui Tam* Case ("U.S. Notice to Decline").  On or about February 11,

2015, the State of Florida similar filed a Notice of Election to Decline Intervention in the *Qui Tam*

Case ("FL Notice to Decline").  The Notices to Decline were also filed under seal.

30.      On or about February 12, 2015, District Court Judge Kathleen M. Williams filed

an Order granting the U.S. Notice to Decline and FL Notice to Decline.  The Court's Order was

filed under seal.

31.      On or about February 12, 2015, the Clerk of the District Court for the Southern

District of Florida unsealed the *Qui Tam* Case pursuant to the Court's Order granting the U.S. and

FL Notices to Decline.

32.      On or about April 3, 2015, the *Qui Tam* Relators, through their attorneys,

Leopold, Martin, Kroeger, the Cohen Firm, Gitkin, the Salpeter Firm, Kaiser, and the Kaiser Firm

(collectively, "Relators' Counsel"), filed their First Amended Complaint for Violations of the

Federal False Claims Act [31 U.S.C. §§ 3729 *et seq.*] and Florida False Claims Act [§§ 68.081 *et*

*seq.*, Fla. Stat.] ("Amended *Qui Tam* Complaint").  The Amended *Qui Tam* Complaint was the first

document in the *Qui Tam* Case to <u>not</u> be filed under seal.  Defendant Leopold signed the Amended

*Qui Tam* Complaint.

33.      AHF vigorously disputes the allegations in the Amended *Qui Tam* Complaint,

denies any wrongdoing, and will aggressively defend itself from what it believes and intends to

prove are baseless claims.

34.     At the time the First Amended *Qui Tam* Complaint was filed, and even before

serving AHF with the First Amended *Qui Tam* Complaint, Defendants published a press release,

which lead counsel (on information and belief, Leopold and the Cohen Firm) also published on its

firm website, that contained a link to a highly-sensitive, confidential document with AHF patient

HIV test results ("the Patient List.")  This document, as described by Defendants, is a spreadsheet

generated by AHF of HIV-positive patients that lists more than 840 patients who were linked to

medical care. The Patient List contains around 680 unique medical record numbers, 27 telephone

numbers, 2 street addresses, 37 email addresses, in whole or part, some with names included in the

email address – all elements that must be removed in order to "de-identify" protected health

information in accordance with the law.  45 C.F.R. § 164.514(b)(ii).

35.     Defendants deliberately sought maximum press coverage of their suit, and in the

week following the filing of the First Amended *Qui Tam* Complaint and the Cohen Firm's website

posting, the press release was picked up by numerous news outlets including Associated Press, CBS

News, and Fox News to name a few.

36.     As AHF had not been served with the First Amended *Qui Tam* Complaint prior to

Defendants' press blitz, AHF was only able to review the website posting, press release and First

Amended *Qui Tam* Complaint after it learned about the lawsuit from the news.  Only then did AHF

realize that Defendants had improperly published confidential health information about individuals

who tested positive for HIV.

37.     The Patient List is an extract from AHF's Public Health Department's Client

Database, which collects demographic and other data obtained by AHF's linkage staff about

individuals who were found to have tested positive through one of AHF's testing programs

throughout the country or referred to AHF by a partner organization.  Access to the Database is by

permission only, and only given to staff with a need to input data, provide quality assurance, run reports or other need-to-know bases.  Individuals without access to the Database cannot open the file.

38.     As a Director of Public Health, Carrel had access to the Client Database and/or supervised staff with access to the Database.  As Senior Program Manager, Ferrer had access to the Client Database and/or supervised staff with access to the Database.  On information and belief, Carrel and Ferrer obtained the Patient List by accessing the Client Database (or causing staff to access the Client Database on their behalf) without authorization and for use in connection with their *Qui Tam* Complaint.

39.     However it was obtained, the Patient List is now in the possession of one or more of the Relators, who provided the Patient List to Relators' Counsel.  Neither the Relators nor Relators' Counsel have any lawful right to retain the List, let alone publish it, without patient authorization, which, on information and belief, they did not obtain.  Moreover, given the nature of the list and the Database, it is extremely likely that the Defendants possess additional confidential patient information.

40.     AHF wrote Relators' Counsel on April 13, 2015 to demand removal of the Patient List from the public domain and return it and any and all other misappropriated documents.  On or about April 14, 2015, the *Qui Tam* Relators filed a motion to withdraw certain portions of their Amended Complaint, which the district court granted on April 16, 2015.  Relators Counsel appear to have since removed the links to the Patient List in their press release and website.  However, these actions cannot change the fact that in the two weeks between the filing of the First Amended *Qui Tam* Complaint and Relators Counsel's actions, the Patient List was accessed by numerous

third parties.  Any downloaded copies are now outside the control of the court, Relators or their

Counsel and pose a continuing threat of harm to AHF and its patients.

41.      On April 16 and 17, 2015, AHF counsel spoke to Leopold about the need to

return the Patient List and all other confidential documents pursuant to HIPAA and Florida law.

When Defendants failed to respond to these requests, AHF wrote Relators' Counsel on April 20,

2015 requesting information about the extent to which the Patient List may have been accessed by

third parties and steps taken by Defendants to secure all copies.  AHF again demanded return of the

Patient List, all underlying documents from which it was derived, and any other documents with

individually identifiable information about any AHF patient or recipient of HIV test.   AHF

required a response to its letter by April 22nd.  To date, Defendants have not responded to the April

20, 2015 letter nor returned any documents, including the Patient List.

42.      However the Patient List was originally obtained by one or more of the *Qui Tam*

Relators, the Relators have no right to possess or use the List now.  Their continued possession of it

and use of it for any reason is not authorized by the individuals whose information is on the List.

The Relators were not authorized to disclose the List to Relators' Counsel, nor were the Relators or

their Counsel authorized to publish the List anywhere, including on websites and with press

releases.

43.      Defendants' actions violated HIPAA and Florida Law, both of which are designed

to protect against the disclosure or publication of individuals' confidential health information.

Moreover, the Qui Tam Relators violated the Employment Agreements by taking and retaining the

Patient List, and disseminating it (and likely other protected information) to any person, including

but not limited to the Relators' Counsel.  By publishing links to the Patient List, among other

places, on one or more websites and including the Patient List in one or more press releases, all

Defendants publicly disseminated this highly confidential information and, in the process, further violated federal and state law.

44.     Upon information and belief, none of the patients identified on the Patient List provided expressed written consent to permit disclosure. Currently, the Patient List is in the hands of unknown numbers of third parties, as well as in the hands of Relators and their Counsel.  There is no assurance that the Patient List, in all its versions (paper and electronic) is secured to HIPAA and state standards.   Moreover, none of the people who possess the Patient List are covered entities with statutory duties under HIPAA and state patient record confidentiality laws to continue to maintain the confidentiality of the Patient List over time.  For these reasons, as well as all the other reasons in this Complaint, all known copies of the Patient List must be returned to AHF for safekeeping.

45.     Upon information and belief, the *Qui Tam* Relators improperly and illegally took additional highly-sensitive and confidential documents from AHF, the identity of which cannot be specifically identified as of the filing of this Complaint.  Accordingly, AHF intends to promptly seek expedited discovery to discern the extent of Defendants' malfeasance.

46.     Through this Complaint, AHF seeks injunctive relief including an order (i) prohibiting Defendants from any use, disclosure or further publication of the Patient List, in its unredacted and redacted forms, and any and all other AHF highly-sensitive and confidential documents that, upon information and belief, Defendants improperly and illegally possess; (ii) prohibiting Defendants from altering, destroying, deleting or otherwise disposing of any hard drives, external-storage devices, electronic documents, or hard-copy documents that may contain information related to the Patient List (except as may be expressly ordered by this Court, pursuant to HIPAA destruction standards and verified by AHF); and (iii) demanding the return of the Patient

List, in its unredacted and redacted form, and any and all other AHF highly-sensitive and confidential documents that, upon information and belief, Defendants improperly and illegally possess, to AHF, including the original and any copies thereof, including electronic- or hard-copies. AHF also seeks compensatory damages and other appropriate relief.

## CLAIMS

**COUNT I: Conversion (All Defendants)**

47.     AHF restates all of its statements and allegations set forth above as if fully rewritten herein.

48.     AHF's property and assets include AHF's highly-sensitive and confidential information and documents – including but not limited to documents protected under HIPAA and similar state laws – as alleged above.

49.     The *Qui Tam* Relators wrongfully obtained and continue to possess AHF's highly-sensitive, confidential and HIPAA-protected information and documents and provided said information and documents to Relators' Counsel. All Defendants thereafter used, disseminated and refused to return AHF's highly-sensitive, confidential and HIPAA-protected information and documents as set forth above.

50.     Defendants have no right to possess this information or these documents, and have not returned them to AHF, despite AHF's demand to do so.

51.     As a direct and proximate result of Defendants' conversion, AHF has suffered damages in an amount to be proven at trial.

**COUNT II: Breach of the Employment Agreements (Defendants Carrel, Ferrer, and Loftis).**

52.     AHF restates all of its statements and allegations set forth above as if fully rewritten herein.

53.     AHF and Carrel entered into the Carrel Agreement and additional confidentiality agreements, which are binding and enforceable agreements.

54.     AHF and Ferrer entered into the Ferrer Agreement and additional confidentiality agreements, which are binding and enforceable agreement.

55.     AHF and Loftis entered into the Loftis Agreement and additional confidentiality agreements, which are binding and enforceable agreements.

56.     AHF has complied with all of its obligations under the Carrel Agreement, the Ferrer Agreement, the Loftis Agreement and the additional confidentiality agreements.

57.     Based upon the above-described acts and omissions of Carrel, Ferrer, and Loftis as they relate to obtaining, retaining, and disseminating the Patient List, Carrel, Ferrer, and Loftis have breached their respective Employment Agreement and confidentiality agreements with AHF.

58.     Upon information and belief, Carrel, Ferrer, and/or Loftis also improperly obtained, retained, and disseminated other highly-sensitive and confidential AHF documents – including but not limited to documents protected under the federal Health Insurance Portability and Accountability Act ("HIPAA") and similar state laws – which also constitutes a breach of their respective Employment Agreement and confidentiality agreements with AHF.

59.     As a direct and proximate result of Carrel's, Ferrer's, and Loftis' breach of their respective Employment Agreements and confidentiality agreements, AHF has suffered damages in an amount to be proven at trial.

**COUNT III**: **Tortious Interference with a Contract (Defendants Theodore J. Leopold, Esq., Cohen Milstein Sellers & Toll, PLLC, Salpeter Gitkin, LLP, and the Kaiser Law Firm, PLLC).**

60.     AHF restates all of its statements and allegations set forth above as if fully rewritten herein.

61.     AHF had a contractual relationship with Defendants Carrel, Ferrer and Loftis, as set forth above.

62.     At all relevant times, Defendants Theodore J. Leopold, Esq., Cohen Milstein Sellers & Toll, PLLC, Salpeter Gitkin, LLP, and the Kaiser Law Firm, PLLC had knowledge AHF's contractual relationship with Defendants Carrel, Ferrer and Loftis.

63.     Defendants Theodore J. Leopold, Esq., Cohen Milstein Sellers & Toll, PLLC, Salpeter Gitkin, LLP, and the Kaiser Law Firm, PLLC intentionally interfered with AHF's contractual relationship with Defendants Carrel, Ferrer and Loftis, as set forth above.

64.     As a direct and proximate result of Defendants Theodore J. Leopold, Esq., Cohen Milstein Sellers & Toll, PLLC, Salpeter Gitkin, LLP, and the Kaiser Law Firm, PLLC's interference with AHF's contractual relationship with Defendants Carrel, Ferrer and Loftis, AHF has suffered damages in an amount to be proven at trial.

## INJUNCTIVE RELIEF

65.     AHF will suffer irreparable and immeasurable harm if Defendants are not (i) prohibited from any use, disclosure or further publication of the Patient List, in its unredacted and redacted forms, and any and all other AHF highly-sensitive and confidential documents that, upon information and belief, Defendants improperly and illegally possess; (ii) prohibited from altering, destroying, deleting or otherwise disposing of any hard drives, external-storage devices, electronic documents, or hard-copy documents that may contain information related to the Patient List (except as may be expressly ordered by this Court, pursuant to HIPAA destruction standards); and (iii) ordered to return the Patient List, in its unredacted and redacted form, and any and all other AHF highly-sensitive and confidential documents that Defendants improperly and illegally possess, to AHF, including the original and any copies thereof, including electronic- or hard-copies.

66.     AHF further alleges that, upon information and belief, there is a substantial

likelihood that, if not restrained, enjoined, and order to take the actions set forth in the preceding

paragraph, Defendants will continue using and/or disclosing AHF's  confidential and proprietary

information for their benefit and to AHF's and its patients' harm.  Moreover, there is a

substantial likelihood that, if Defendants are allowed to continue to keep the Patient List and

other confidential and proprietary information, they will not be able to safeguard them as

required by law.

WHEREFORE, AHF prays for judgment in its favor and against Defendants, jointly and

severally, for an injunction as set forth above, compensatory damages, interest, attorney fees, and

costs in amounts to be proven at trial.  AHF also prays for any other relief that the Court deems

just and proper.

## DEMAND FOR JURY TRIAL

AHF demands trial by jury on all issues so triable by right.

Date: April 24, 2015                    Respectfully Submitted,

**MARCUS NEIMAN & RASHBAUM**
100 Southeast Third Avenue
Suite 805
Fort Lauderdale, FL 33394
Tel:  (954)-462-1200
Fax: (954)-688-2492

By:/s/ Jeffrey A. Neiman_____
Jeffrey A. Neiman
Fla. Bar No. 544469
jneiman@mnrlawfirm.com
Jeffrey E. Marcus
Fla. Bar No. 310890
jmarcus@mnrlawfirm.com

**BIRD MARELLA**
1875 Century Park East
Suite 2300
Los Angeles, CA  90067

Tel:  (310) 201-2100
Fax:  (310) 201-2110
Paul S. Chan (*Pro Hac Vice Application Pending*)
psc@birdmarella.com
Mitchell A. Kamin (*Pro Hac Vice Application Pending*)
mak@birdmarella.com
Marc E. Masters (*Pro Hac Vice Application Pending*)
mem@birdmarella.com

*Attorneys for Plaintiff AIDS Healthcare Foundation, Inc.*